## BADER COAL CO. et al. v. QUEMAHONING COAL CO. et al.

(Circuit Court of Appeals, Third Circuit. September 17, 1926.)

No. 3446.

1. **Evidence** ⚖129(6)—Buyer being entitled to proportion of coal under his contract in case of car shortage, evidence that seller breached contracts with other buyers, and furnished their cars and coal to third persons, was not admissible.

Plaintiff's contract of purchase from defendant of coal to be delivered from month to month, entitling it in case of car shortage only to such deliveries as could be made under a pro rata apportionment of available cars between plaintiff and holders of contracts with defendant at time of contract with plaintiff, evidence that defendant breached such other contracts, and furnished the cars and coal to which such other contract holders were entitled to third persons, was not admissible in action for breach of plaintiff's contract.

2. **Sales** ⚖181(2)—Under contract for sale of coal, providing for pro rata apportionment of cars in case of shortage, contract with government to furnish coal when and as demanded was to be considered for full amount, though only small amount was demanded.

Under contract of defendant to furnish plaintiff certain amount of coal per month, with provision, in case of car shortage, for pro rata apportionment of cars, and consequent deliveries of coal, between plaintiff and holders of other contracts with defendant, *held*, contract to furnish government a large amount of coal in monthly deliveries, when and as called for by it, was to be considered for full amount in prorating, though government called for only small part of coal.

3. **Evidence** ⚖355(5).

Admitting tables, mainly to aid jury, showing what had been done to knowledge of witness, as testified by him, and excluding tables showing calculations made by another witness, not on his own knowledge, but on the testimony of others, and on conclusions he had drawn therefrom, *held* not error.

In Error to the District Court of the United States for the Western District of Pennsylvania; W. H. Seward Thomson, Judge.

Action by the Bader Coal Company, for the use of the Bader Coal & Fireproofing Company and another, against the Quemahoning Coal Company and another. Plaintiffs had judgment for less than claimed, and bring error. Affirmed.

William M. Robinson, David A. Reed, and Samuel McClay, all of Pittsburgh, Pa., and Harry M. Rimer, of Clarion, Pa., for plaintiffs in error.

Gordon, Smith, Buchanan & Scott, of Pittsburgh, Pa., and Francis J. Kooser and Ernest O. Kooser, both of Somerset, Pa. (John G. Buchanan, William Watson Smith, and Leon E. Hickman, all of Pittsburgh, Pa., of counsel), for defendants in error.

Before BUFFINGTON and WOOLLEY, Circuit Judges, and GIBSON, District Judge.

WOOLLEY, Circuit Judge. Dissatisfied with the amount of their recovery, the plaintiffs below bring here for review a judgment of the District Court entered on a verdict in their favor for damages arising from the defendants' breach of a contract for the

sale and delivery of coal. Performance by the defendants was conditioned on car supply—an ever fruitful source of controversy —affected by difficulties generally incident to periods of car shortage and peculiarly incident to periods of shipment embargoes. Under bewildering pleadings, amended again and again, manifold issues of fact were raised, until, as the learned trial judge observed, the case became "altogether unique, in the length of time that has been occupied in the trial, in the magnitude and in the complication of the questions involved." We shall confine this review to the questions raised on the writ of error. Greatly abridged, the material facts are as follows:

By the contract, dated May 6, 1920, the defendants engaged to sell and deliver f. o. b. cars at their mines and the plaintiffs promised to take and pay for 225,000 tons of coal of different grades at a named price based on cost of production at the time, subject to change with increased cost of production, deliveries to be made in approximately equal monthly installments until April 1, 1921—monthly tonnage not cumulative.

Of the many provisions of the contract in respect to performance, only two need be stated. The first is a clause, common in contracts of this kind, anticipating an always possible shortage of cars during the term. It is in these words:

"Deliveries or shipments of coal hereunder shall be subject to delays occasioned by * * * insufficient car supply, the failure of the Railroad Company to supply cars at the mines for loading, or any other cause beyond the control of the seller."

But it happened that at the time the contract was executed there was a car shortage. All parties knew it. So, not in anticipation of such an event in the future but in recognition of its present existence, Zimmerman, one of the defendants, drafted and the parties inserted in the contract a clause indicating how they intended performance in the circumstances. It is as follows:

"The supply of cars and the rate based to our output is based on the output of the month of March, 1920, and we will apportionate this contract accordingly."

Apart from the doubtful meaning of this provision, it is clear the contract was not for the sale of coal absolutely but was for deliveries conditioned, first, on car supply, and, second, in the event of car shortage, on the method of distribution agreed upon.

At the trial there was no dispute about mine output, mine ratings, tonnage shipped, or the monthly percentages of the restricted car supply, but there immediately arose a dispute about the apportionment of deliveries which the defendants had made between their contract with the plaintiffs and their contracts with other concerns then in force. This dispute—fundamental to the plaintiffs' right and amount of recovery— turned on the meaning of the second car supply clause to which the opposing parties gave wholly opposite interpretations. If the defendants' construction was right, they had (aside from issues of fact not now involved because determined by the jury) made full performance. On the other hand, if the plaintiffs' construction was right, the defendants had defaulted and the plaintiffs were entitled to very substantial damages.

Because of palpable ambiguity in its terms, the learned trial judge submitted the clause to the jury for construction. This action is not assigned as error. The errors assigned have to do with his rulings on evidence later reflected in his instructions to the jury as to how they should measure the defendants' obligation to make deliveries in periods of car shortage; whether by apportionment between contracts outstanding at the time the car shortage arose or according as they did or did not make deliveries on their other contracts. Also the assignments charge error in the admission of certain evidence offered by the defendants and the rejection of certain evidence offered by the plaintiffs.

Whether the learned trial judge committed errors in the trial, and, if so, whether they were prejudicial, depend largely on the grasp which he had of the issues and on the law he applied to them. There is no question that the judge had a firm hold on the issues. In this he was aided by the clear though opposite contentions made by opposing counsel in respect to the construction of the clause in dispute.

Before stating this conflict of views, it is pertinent to note that at the trial it was proved and not disputed that in March, 1920, —the test period—there was only a 57 per cent. car supply. From May to November, both inclusive, it varied from 36 per cent. to 63 per cent. For the remaining months of the contract there was no car shortage.

The defendants' construction of the second car supply clause was that when there was *any* car shortage, they should deliver and the plaintiffs should accept that percentage of the contract amount which

was equal to the March car supply and mine output. They contended that, inasmuch as there was only a 57 per cent. car supply in March, 1920, and assuming that the supply might vary during the coming months, the parties established this percentage as an unvarying standard, to run through the entire contract and be binding on the parties whenever there was any car shortage, without reference to its amount. To illustrate, if during a car shortage there was a car supply of a percentage higher than that of March, 1920, the defendants would still be required to deliver and the plaintiffs entitled to demand only 57 per cent. of the coal provided for in the contract. If, conceivably, there was a total embargo placed upon the railroad—which is the most extreme case that can be put—so that no cars could be supplied in any month, the defendants would, nevertheless, be required to furnish 57 per cent. of the coal called for by the contract, or pay damages for their failure.

On the other hand, the plaintiffs' construction of the clause was that if the March car supply and mine output were maintained, *full* deliveries should be made; but if the car supply and mine output were reduced below that of March, apportionment of deliveries should be made between the contract in suit and the defendants' contracts with others, subsisting at the time, upon the well-known basis of apportionment applicable under the first car supply clause. They say the parties recognized there was an existing car shortage at the time the contract was made, and notwithstanding this shortage, the defendants agreed to furnish coal, not on a basis of 100 per cent. car supply which would exist under normal conditions but under the conditions of car shortage as they existed in March, 1920; and that, on that basis, the defendants undertook to perform their contract in full. To illustrate, in case the car shortage increased and the car supply fell below 57 per cent., the defendants would be entitled to prorate between the plaintiffs' contract and other valid contracts in force at the time such car shortage arose. Should the car supply at any time improve in any percentage above 57 per cent., the defendants would have to deliver the full amount of coal contemplated by the contract.

Intending to submit the second car supply clause to the jury for interpretation, the learned trial judge, of course, had to admit evidence under both of these wholly opposite constructions, and, indeed, under any other possible construction, for he could not know what the jury would decide was the true construction. He did this by admitting evidence of what the parties said and did immediately preceding the signing of the contract. Also, he had to instruct the jury on the law as to how, after coming to their judgment on this issue, they should frame a verdict. This he did by instructing them in the alternative according as they should construe the clause in dispute for the plaintiffs or for the defendants, and by telling them, consistently with his uniform rulings on evidence during the trial when he invoked the law of the first McKeefrey Case —McKeefrey et al. v. Connellsville Coke & Iron Co., 56 F. 212, 5 C. C. A. 482—that, should their interpretation be one calling for apportioned deliveries, the defendants' obligation was to apportion the variable car supply between their contract with the plaintiffs and all other contracts which they (the jury) should find validly subsisted at the time the shortage arose. In the peculiar situation of this case where a car shortage existed at the beginning of the contract and continued without interruption for seven months, the defendants did not claim a right to prorate any contract made after the date of the contract in suit. That date, therefore, became the pivot on which the issue of what contracts should have participated in the apportionment turned.

[1] The many assignments of error are directed to two general propositions which relate to the rulings of the trial judge on questions of evidence. The first is that when the defendants, in order to justify short deliveries, relied upon a car shortage and the right to apportion their curtailed production among all other subsisting contracts, the plaintiffs were improperly denied the right to show the actual disposition of defendants' production through large spot sales and the absence of any intent or effort at fair apportionment.

The learned trial judge, throughout the trial, pursued a policy of allowing unrestricted testimony in regard to what contracts, entitled to apportionment with that of the plaintiffs, existed at the date of the contract in suit and in regard to what were their terms. Nine other contracts were offered in evidence. The judge struck out one and the controversy revolved around the remaining eight. On this issue he opened wide the doors and let everything in. Of this the plaintiffs do not complain. Their complaint is that thereafter he would not allow them to show that the defendants, in peri-

ods of reduced car supply, breached their other contracts by making short deliveries, sold the difference on the spot market and made deliveries of spot sales in cars that were available for larger shipments to the plaintiffs.

We think the learned trial judge was right, and for these reasons: The plaintiffs brought this suit to redress a wrong. The wrong they charge was a violation of some right which belonged to them. That right was a fair distribution of coal during a period of car shortage. What is fair distribution in such a situation was decided long ago by this court in the first McKeefrey Case. That, too, was a case between producer and purchaser. The decision was that distribution of deliveries in available cars should be made proportionately among the orders on hand. When done in this way, the distribution is fair. Under this rule, therefore, the defendants' coal deliveries in the available car supply should have been apportioned among their contract obligations. If they did this, and if the plaintiffs received their pro rata share, that was all they were entitled to receive. If the defendants breached their contracts with other purchasers, that was a wrong of which they alone could complain. Certainly that wrong would not enure to the plaintiffs and confer a right of action on them. Moreover, the defendants' failure to make deliveries to others would not change the apportionment, if properly made, nor raise the tonnage, to which, under the contract, the plaintiffs would be entitled. It follows therefore that the division of car supply among subsisting obligations, not the manner in which the producer has performed all of them, is the test of proper distribution. If, during the car shortage, the plaintiffs received deliveries in an amount reckoned on the relation of available cars to the defendants' subsisting contract obligations, they have, as the court said in the first McKeefrey Case, no ground for complaint. Jessup & Moore Paper Co. v. Piper et al. (C. C.) 133 F. 108; Consolidation Coal Co. v. Peninsular Portland Cement Co. (C. C. A.) 272 F. 625. We are of opinion that in his many rulings excluding evidence offered to prove that the defendants breached contracts other than the one in suit, the learned trial judge committed no error.

[2] On the issue of the existence of the eight other contracts, and on another issue as to whether all should share in the pro rata distribution, the learned trial judge interpreted two, and, in respect to them, based his rulings on evidence and instructions to the jury on that interpretation. These were contracts between the defendants and the War Department. The plaintiffs termed them "options." They covered a large tonnage of coal in monthly deliveries, when and as called for by the Department. The defendants, feeling themselves obliged by the terms of these contracts to deliver the coal when called for, included the contract amounts in their prorating calculations. The War Department, it turned out, called for only a small part. It was evident to the learned trial judge, as it is to us, that on any day during a given month the War Department might call on the defendants to perform their contracts by shipping any part or the whole of the stipulated tonnage and that it was not until the end of the month that the defendants could know just how much coal it would demand. It is clear that if these contracts had been excluded from the apportioning calculations and the coal applicable to them had been delivered to the plaintiffs, the defendants would, on a call for coal by the War Department, have breached their contracts and would have been liable in damages. That the War Department took less than what the contracts provided for did not change the character of the defendants' obligation to deliver all that might be demanded. We therefore concur in the instruction which the learned trial judge gave the jury when he said:

"I feel constrained to instruct you that (notwithstanding the small amount actually called for and delivered) there would be a legal obligation resting upon the defendants to make deliveries when called for over the balance of the term, which, it appears, was two months; and that if this legal liability existed it entitled the defendants to make the pro rata distribution of this coal."

[3] The second proposition to which the assignments of error are addressed is stated by the plaintiffs thus: When the defendants were permitted to offer in evidence statements giving conclusions of a witness as to percentages of car supply and the proper basis of apportionment, based on his construction of written instruments and his interpretation of oral testimony, plaintiffs were improperly denied the right to introduce statements summarizing the evidence regarding shipping instructions, embargoes and permits.

This, as we read the record, is not quite an accurate statement of what happened.

Graham, manager of the defendant coal company, having testified of his own knowledge as to mine production, car supply, coal shipments and the method of prorating coal between the contract in suit and other contracts, produced tables elaborately showing what had been done. These, over formal objection, were admitted in evidence mainly to aid the jury in remembering the mass of details testified to, and were admitted, as the judge said, "as the witness' method of calculation, without determining the legality of this method of distribution." Later in the trial the plaintiffs produced a witness, Gardner, and offered tables showing calculations he had made, not on knowledge of his own but on the testimony of others and on the conclusions he had drawn therefrom. The court, stating that "nobody can draw conclusions from the testimony of any other witness except the jury," excluded the proffered testimony as incompetent. On exceptions to this ruling and to a ruling on a motion to strike out Graham's testimony made by the plaintiffs at the end of the trial, these assignments of error are grounded.

We have with much labor made a careful study of this phase of the case. A recital of all matters to which the contesting papers relate, of comparisons of their entries with matters which had or which had not been testified to, and of what are conclusions of the witnesses and what are not, would extend this opinion beyond all reasonable bounds. It will be enough to say that while the task of matching their many details with the evidence was exacting, and not in every instance satisfactory, we are clearly of opinion that the learned trial judge drew a valid distinction between the opposing writings and, within the scope of his discretion, committed no error in admitting one and rejecting the other.

The judgment below is affirmed.