AUGUSTINE v. BOWLES, Adm'r, Office of Price Administration.

No. 10830.

Circuit Court of Appeals, Ninth Circuit.

April 24, 1945.

J. W. Ehrlich, of San Francisco, Cal. (Roy A. Sharff and John F. O'Sullivan, both of San Francisco, Cal., of counsel), for appellant.

Thomas I. Emerson, Deputy Adm'r for Enforcement, OPA, Fleming James, Jr., Director, Litigation Division, David London, Chief, Appellate Branch, and Edward H. Hatton, Atty., OPA, all of Washington, D. C., W. Dunlap Cannon, Jr., Regional Litigation Atty., and Thomas C. Ryan, Dist. Enforcement Atty., OPA, both of San Francisco, Cal., for appellee.

Before GARRECHT, STEPHENS, and BONE, Circuit Judges.

BONE, Circuit Judge.

This is an appeal by Jim Augustine, the defendant below, from a final judgment against him, awarding treble damages to plaintiff-appellee as provided by Section 205 (e) of the Emergency Price Control Act, 50 U.S.C.A.Appendix, § 925 (e) (hereinafter called the Act) as well as an injunction provided for in Section 205 (a) of the Act, against the sale of meats at prices in excess of the legal maxima.

The complaint filed by the Price Administrator charged appellant in three counts with selling meats between December 16, 1942 and May 1, 1943, at prices in excess of the ceilings established by Revised Maximum Price Regulation No. 169 as amended (7 Fed. Reg. 10381); Revised Maximum Price Regulation No. 148 as amended (7 Fed. Reg. 8609); and The General Maximum Price Regulation as amended (7 Fed. Reg. 3153). Count four repeated the charges contained in counts one to three, inclusive, and asked for treble damages, alleged to be $41,844.66, and for injunctive relief against further violations of the applicable regulations.

A temporary restraining order was issued July 31, 1943, and a preliminary injunction on August 14, 1943.

The case came on for hearing December 3, 1943. At the conclusion of the trial, the court found that the defendant, Augustine, had sold meats at wholesale to the Piedmont Market, Inc., of Oakland, California, at prices $2,000 in excess of those permitted by the applicable regulations. The court further found that the defendant had sold meats at wholesale to various customers, other than the Piedmont Market, at prices which were $5,817.37 in excess of those established by the regulations. Because of a conflict in testimony between Guerra (President of the Piedmont Market) and appellant, Augustine, the lower court denied the claim which charged defendant with having accepted certain additional "side payments" in cash from Guerra for meats sold in excess of the ceiling prices. The court therefore entered judgment for $25,452.12, three times the amount of the proved overcharges, as well as injunctive relief.

Appellant seeks a reversal of the judgment below on three grounds: (1) That Section 205 (e) is so vague and indefinite as to violate the Fifth Amendment to the Federal Constitution; (2) that the evidence fails to support the trial court's finding

that appellant sold to the Piedmont Market meats at prices exceeding, by the sum of $2,000, the maximum of prices permitted by OPA regulations; (3) that plaintiff's exhibit No. 11, a compilation made by appellee's employees listing alleged over-ceiling sales by appellant to various customers in the sum of $5817.37, was improperly admitted and that, therefore, there was insufficient evidence to sustain the finding that such sales were made.

■ 1. Appellant's attack upon Section 205 (e) of the Act is directed against that part of the section which affords a buyer the right to sue to recover damages for over ceiling charges when he buys a commodity *"for use or consumption other than in the course of trade or business"* and provides that if "the buyer is not entitled to bring suit or action under this subsection, the Administrator may bring such action under this subsection * * *." The appellant maintains that the language of this part of the section is so indefinite that it fixes no "immutable standard" to determine when the buyer or the Price Administrator may bring the action.

Although it is doubtful whether the appellant has been injured by the alleged invalidity in the Act and is, therefore, in a position to raise the constitutional issue, suffice it to say that this court has recently upheld the constitutionality of Section 205 (e) adversely to appellant's contentions. Bowles v. Glick Bros. Lumber Co., 9 Cir., 146 F.2d 566.

2. Appellant challenges the trial court's findings that he sold meat to the Piedmont Market at prices $2,000 in excess of ceiling prices on the basis that "the record contains no evidence whatsoever that substantiates this finding."

During the time in question, appellant occupied as a tenant the back part of the Piedmont Market building and sold wholesale to the Market (which in turn sold the meat as a retail butcher store) and also to other customers. Guerra (President of the Market), and Augustine both testified that Guerra made payments by check at the ceiling prices for meats purchased by the Market during the time in question. Also there is no dispute that during the same period Guerra paid appellant an additional $2,000. There is a conflict, however, concerning why the $2,000 was paid. Appellee contends, and the trial court found, that the sum represented payments over the ceiling prices.

Appellant introduced in evidence a contract entered into between Augustine and Guerra, which stated that the $2,000 was consideration for cancellation of appellant's rights under his lease with Guerra for the rear of the market; for his agreement to vacate the premises on May 1, 1943; and for his release of certain personal property referred to in the contract. Appellee introduced in evidence certain minutes of a meeting of the directors of the market wherein Guerra revealed to the directors that he had an alleged arrangement with appellant whereby appellant was paid prices over the ceiling because that was the only way appellant could obtain meat from the packers. The minutes state that Guerra paid him over the ceiling prices and such extra amounts were passed on by appellant to the packers. Appellant was also to receive one-half of the market's profits. The minutes show that there was some dispute as to whether appellant was actually paying such overcharges as he collected from Guerra to the packers. The minutes also state that $2,000 was to be paid appellant in full settlement for appellant's claims under the lease and for his agreeing to vacate.

Other explanations of the $2,000 were also given. Appellant testified that he and Guerra had entered into a partnership and that this $2,000 was his share in the profits. Guerra denied that a partnership ever existed and the trial court failed to find that a true partnership existed between the parties. Guerra gave several explanations for the $2,000 payment. One was that it represented one-half of the profits for the period from January 25 to March 29. Guerra also testified that the profits for the market substantially exceeded $4,-000, and in fact amounted to $10,000. Guerra testified at another time that the $2,000 amount was reached by bargaining between himself and appellant.

The appellant does not press the partnership relation on this appeal, but relies mainly on the theory that the $2,000 was paid in consideration for Augustine's abandonment of the lease, or that at least part of the $2,000 was based on this consideration.

From Guerra's testimony it appears that the appellant was once a tenant under a written lease, but that the lease expired in January, 1943, and that appellant held over until April, 1943, paying increased monthly rentals. Appellant's counsel asserts in his brief that an extension of the original lease can be inferred from the facts. In his testimony the appellant gave

no testimony concerning the lease other than the statement that he continued to pay rent after he had entered into the alleged partnership with Guerra. The facts here presented on this issue do not under California law sustain appellant's contention that the lease was renewed. At most they only show that a new month to month tenancy was created. Cal.Civ.Code, § 1945.[1] Thus the contention by appellant that the $2,000 was for consideration for appellant's removal from the premises could well be found questionable by the trial court.

Furthermore, the claim by appellant that a partnership existed between himself and Guerra and that the $2,000 was consideration for discontinuing the lease were inconsistent claims. The trial court resolved this conflict by giving credence to neither claim.[2]

■■ The district court was in a position to judge the comparative credibility of the witnesses, and its finding will not be disturbed unless "clearly erroneous." Federal Rules of Civil Procedure, rule 52 (a), 28 U.S.C.A. following section 723c. We do not feel that appellants have sustained the burden of showing "the court's findings are 'clearly erroneous', due regard being 'given to the opportunities of the trial court to judge of the credibility of the witnesses' * * *." Gates v. General Casualty Co., 9 Cir., 120 F.2d 925, 927.

3. Appellant's third point on appeal concerns his objection to the introduction of Plaintiff's Exhibit No. 11, a compilation showing overcharges made by appellant in the sales of meats to wholesale customers (other than Guerra) at prices in excess of the ceilings thereon. This compilation seems to be the principal evidence upon which the trial court found that appellant had overcharged various customers in the sum of $5,817.37.

The tabulation or "transcript" offered in evidence by the Price Administrator appears to have been compiled in the following manner: One Ortland, an investigator for the OPA, obtained original invoices of the sales in question from Augustine. Ortland took the invoices to the offices of the OPA and had another investigator reduce the information on the invoices in tabulated form. From this tabulation, Ortland compiled the exhibit in question which listed the names of the customers, dates of sale, weights of meats sold, types and grades of meats sold, the price per pound charged by appellant, the selling price permitted by the applicable regulations, and the overcharges. Only Ortland was called by the plaintiff to testify concerning the exhibit. He stated that he did not check every entry in the other investigator's tabulation, but that he "spot-checked any number" of the invoices. Ortland also testified that he talked with many of appellant's customers and inspected the cuts of meat that they were receiving from appellant, many of which were not cut according to OPA regulations.

The invoices from which compilation was made were made available to the defendant and in order that he would have ample time to check the accuracy of the compilation with the invoices, the court continued the case for a week. Appellant never questioned the accuracy of the exhibit during the trial.

The appellant complains that the exhibit is not a summary of the invoices alone, but is "made up of (1) information obtained from memoranda, prepared by another person, (2) hearsay declarations made to Ortland by customers of appellant, and (3) conclusions which Ortland formed from his observations."

■ Where voluminous documents are a necessary part of the evidence in a cause, it is well settled that tabulations of these documents in the forms of charts and schedules may be introduced for the aid of the trier of the fact. 4 Wigmore (3d ed.), § 1230. Most courts require that the mass thus summarily testified to, if the occasion seems to require it, be placed on hand in court so that the opposing party may inspect it and use the material for cross-examination.[3]

■ Appellant's first complaint against the exhibit is that another investigator, not Ortland, made the tabulation from the original invoices. We believe that the testimony of Ortland concerning this exhibit was sufficient without the other investigator taking the stand. Ortland had supervised the making of the exhibit; personally

---

**1** See 15 Cal.Jur. § 237; Kaye v. M'Divani, 6 Cal.App.2d 132, 44 P.2d 371; Agar v. Winslow, 123 Cal. 587, 56 P. 422, 69 Am.St.Rep. 84.

**2** In its memorandum opinion the trial court found that from the evidence "Defendant and Guerra were in pari delicto— they shamelessly planned to defeat price control."

**3** Cooper v. U. S., 8 Cir., 9 F.2d 216; cf., Greenbaum v. United States, 9 Cir., 80 F.2d 113, 120.

obtained the invoices; personally did much other investigatory work on the case; and had checked over a part of the other investigator's tabulations to ascertain their accuracy. Appellants could only have interrogated the other investigator concerning the accuracy of his tabulations from the invoices and they were given ample time in which to check such accuracy.

In United States v. Mortimer, 2 Cir., 118 F.2d 266, 269, certiorari denied 314 U.S. 616, 62 S.Ct. 58, 86 L.Ed. 496, the court said: "There are numerous cases holding admissible on the testimony of a supervising agent statements compiled from voluminous records according to a method at once practicable and offering reasonable guaranty of accuracy, even though the supervisor had not examined each record himself. [Citing numerous cases.] Obviously this rule loses none of its force by reason of the passage of the recent statute, 28 U.S.C.A. § 695, under which writings and records made in the regular course of any business, where it is the regular course of such business to make them, are admissible in any court of the United States." [Citing cases.]

The case of Bader Coal Co. v. Quemahoning Coal Co., 3 Cir., 14 F.2d 743, 747, relied on by appellant, seems distinguishable from the present case because there the witness who testified from tabulations made by others did not appear to have any personal knowledge of the original instruments or be acting in a supervisory capacity in making up the compilation.

Appellant's contention that part of the exhibit was made up from hearsay statements seems without merit. We do not construe Ortland's testimony to mean that the exhibit in question was partly made up from statements made to Ortland by customers of the appellant. Ortland did state in answer to a preliminary question that sources for his information in making up the compilation or transcript were obtained "from the original invoices given to me by Mr. Augustine, also from having contacted any number of restaurants, all or many of whom were customers of Jimmie Augustine, and by personal observation on meat after it had been delivered * * *".

Upon a more comprehensive reading of the investigator's testimony, however, it becomes clear that the compilation was made up from the appellant's invoices and that the only other source for the compiled material was the OPA regulations.[4] We believe the trial court was correct in admitting this tabulation over appellant's objection that it contained hearsay material, that is, that the investigator Ortland had included out of court statements and observations. The summary or tabulation in this case was based upon invoices which were turned over to the appellant and he was afforded a week's time to check the invoices against the tabulation. The tabulation was therefore admissible upon this point. Shreve v. United States, 9 Cir., 103 F.2d 796, 811; cf. Wilkes v. United States, 9 Cir., 80 F.2d 285, 291.

Subsequent to the judgment of the District Court, and pending the appeal in this Court, Section 205 (e) of the Act was amended by Section 108(b) of the Stabilization Extension Act of 1944. Under the amendment, if a seller who made the over ceiling sales proves that the violation was

---

4 Pertinent parts of the testimony are as follows:

"Mr. Ryan: Q. Did you bring these original invoices showing sales by Augustine to the Office of Price Administration and tabulate them onto these records I hold in my hand? A. I tabulated them from memoranda handed to me by Mr. Diamond [investigator for the OPA].

* * * * * *

"Q. From these invoices, the records of Mr. Augustine, did you transpose onto this transcript the name of the customer, date of sale, invoice number, amount of sale, the type of meat sold, the weight of meat sold, the grade of meat sold, the price per pound that Augustine charged, the selling price as per OPA regulations, and the overcharge, if any? A. Yes.

* * * * * *

"Q. Did you and Mr. Diamond, under your supervision, make a total compilation of overcharges on sales made by Mr. Augustine as shown by his own original invoices?

"Mr. Ehrlich: I object to that on the ground it has not been shown it is a true transcript. The best evidence in this case is the invoices and Augustine, himself. A compilation by an agent is not the best evidence. It is hearsay. For that reason it would be incompetent, irrelevant, and immaterial.

"The Court: I don't think we need to argue that. I will overrule that objection. You are offering this as a compilation made from the invoices of the defendant?

"Mr. Ryan: That is correct, your Honor."

neither willful nor the result of failure to take practicable precautions against the occurrence of the violation, his liability under the section is established, but may be reduced to the amount of the overcharge, or $25.00, whichever is greater. Appellant expressly waived any reliance upon this amendment and, therefore, this court does not feel it necessary at this time to determine whether under Section 108 (c) of the Stabilization Extension Act of 1944 the amendment to Section 205 (e) of the Act is applicable to this case.

Judgment affirmed.