**RYDER TRUCK RENTAL, INC.,**
Appellant,

v.

**NATIONAL PACKING COMPANY, Inc.,**
Appellee.

**NATIONAL PACKING COMPANY, Inc.,**
Appellant,

v.

**RYDER TRUCK RENTAL, INC.,**
Appellee.

**Nos. 8669, 8670.**

United States Court of Appeals
Tenth Circuit.

June 23, 1967.

Rehearing Denied in No. 8669
July 27, 1967.

---

6. Plattner, R. p. 1491; Jacovino, R. pp. 1533–1537; Scorzello, R. pp. 1555–1559.

James F. Duncan, Kansas City, Mo. (Robert H. Bingham, Douglas Stripp and Russell W. Baker, Kansas City, Mo., were with him on brief) for Ryder Truck Rental, Inc.

George Schwelger, Jr., Kansas City, Mo. (Edward A. Smith and George M. Winger, Kansas City, Mo., were with him on brief) for National Packing Company, Inc.

Before MURRAH, Chief Judge, LEWIS, Circuit Judge and CHRISTENSEN, District Judge.

MURRAH, Chief Judge.

On remand of this case[1] for trial on the issue of damages for breach of the truck lease the jury returned a verdict for Ryder on Count I for rentals due for the period preceding the alleged cancellation of the lease, and on Count II for difference money damages for the refusal of National to purchase the leased fleet of tractor-trailers as it became obligated to do in the event it breached the lease. The trial judge let stand the verdict on Count I, but granted judgment n. o. v. in favor of National on Count II. Both sides appeal, Ryder contending that judgment n. o. v. was improvidently granted on Count II, and National contending that evidential errors infected the trial of both Counts. After setting out the necessary facts we shall first consider the judgment n. o. v. issue, for if it was properly granted, we need consider National's claims of evidential error only as they relate to Count I.

As more fully described in our prior opinion this was essentially a use lease with rentals calculated according to the mileage which the 30 subject tractor-trailers were driven by the lessee. The agreement also contained a number of provisions, some optional and some mandatory, providing for purchase of the leased equipment by the lessee. Among these provisions was the following critical language:

"In the event that breach or default by the Lessee [National] is the cause of election by the Owner to cancel and terminate this Lease and Agreement, the Lessee agrees to purchase the vehicles then covered by this Lease and Agreement, paying to the Owner the price computed in accordance with Paragraph No. 6C(I) herein and if the Lessee shall fail to pay the said purchase price the Owner may sell the vehicles at public sale and the Lessee shall be liable to the Owner for the difference between the said purchase price and the amount realized at such sale."

The parties harmoniously performed their respective lease obligations for a period of some six months. But, by February 13, 1960, all 30 units had been returned to Ryder, and no further use was made of them in the ensuing months by either National or its assignee. On July 12, 1960, Ryder wrote National, asserting that the continuing non-use of the equipment amounted to a breach of the agreement, and demanding that National pay the contract price for the trucks and all other damages resulting from the breach. The letter further stated that

1. Ryder Truck Rental, Inc., v. Central Packing Company, Inc., 10 Cir., 341 F. 2d 321. Central Packing Company, Inc., was the predecessor of National Packing Company, Inc. In this opinion we shall refer solely to "National", although many of the events in question occurred before the change in corporate name took place.

the trucks would be available for National to take possession during the following seven days upon payment of the price, and that if payment was not made within that time Ryder would dispose of the vehicles in mitigation of its losses. National replied on July 18, denying that it was in breach, and refusing to pay the demanded contract price or any other damages. When the case was here the first time we decided that non-use of the equipment did constitute a breach of the lease obligation, and that issue is no longer open to dispute.

Following receipt of National's letter, Ryder sold eight of the leased tractors and eleven of the leased trailers at private sale. It retained the remaining units for use in its leasing system. On trial of the case for damages Ryder introduced proof of the difference between the agreed contract price and the private sale price for the units it had sold. For the remaining units proof was received of the difference between the agreed contract price and a figure which Ryder's expert testified was, in his opinion, in excess of the true market value.[2] There was no countervailing evidence of value, and no complaint is made of the sufficiency of proof to support the verdict.

█ The trial court's judgment n. o. v. on Count II is based squarely upon his interpretation of the foregoing sale provision to mean that Ryder's exclusive remedy for breach of National's obligation to purchase the trucks was damages computed by the difference between the agreed contract price and the amount realized "at public sale". In other words he construed the contract to require public sale of the trucks as a condition precedent to any recovery under Count II.

And, since admittedly no public sale was held, judgment n. o. v. was proper. We hold that this interpretation of the contract is erroneous, and that public sale is not a condition precedent to Ryder's right to recover under Count II.

Before, however, we reach our interpretation of the critical sale provision, we must first deal with National's preliminary contention that cancellation of the lease was a condition precedent to its duty to purchase in the first instance; that the contract was never cancelled; and that therefore its promise to purchase the trucks never ripened into an enforceable obligation. The following pertinent provision immediately preceded the sale provision:

> "If the breach or default shall continue for seven (7) days after written notice thereof shall have been mailed to the party in default, the Party not in default may at its election cancel and terminate this Lease and Agreement immediately upon the mailing of written notice of such cancellation and termination to the other Party."

Ryder's July 12 letter clearly performed the office of the first required notice, but no subsequent notice of cancellation was ever sent by Ryder after the seven day waiting period. This being so, National denies that the contract was ever cancelled. Cancellation was not an issue in the first appeal; indeed we there assumed that the contract had been cancelled. It was not made an issue in the second trial until the day before trial; the trial judge nevertheless considered it as an issue in the case, although failure to give the second notice was clearly not the basis for the judgment n. o. v.

2. Ryder's expert testified that on July 19, each of the 29 Mack tractors was worth $7,000, and each of the 30 Fruehauf trailers was worth $7,500–$8,000. But, Ryder did not seek damages based on these values. It had received $10,000 each for the eight Mack tractors it sold at private sale, and in computing its damages it placed this value on the retained Mack tractors. It placed a value of $12,700 on the one retained International tractor (the expert valued it at $9,000). Further, Ryder received $9,600 for eight of the eleven trailers it had sold, and it placed this value on the retained trailers. Thus in computing its damages, Ryder assigned the unsold units a value much in excess of what its own expert testified they were worth. Ryder sought some $170,000 under Count II, and the jury awarded it some $95,000.

■ We are satisfied that even if cancellation was a condition precedent to National's duty to purchase the equipment, performance of this condition was excused by National's letter of July 18 in which it denied that it was in default and flatly refused to pay the demanded contract price. Ryder's July 12 letter clearly stated that if National did not purchase the trucks within seven days Ryder would dispose of them in the best way possible to mitigate its losses. National's answer was an unqualified statement that it had not breached the lease and would not pay the demanded contract price. In these circumstances a second notice would have been a useless thing, and was excused as a condition precedent to National's obligation to purchase. See Conti v. United States, 1 Cir., 158 F.2d 581, citing Restatement, Contracts, § 306, and Williston on Contracts, revised edition § 698 (A).

■ It is thus clear that National, in refusing to purchase the trucks, breached its promise to purchase, and the only remaining question concerns the remedies available to Ryder for this breach; this brings us back to interpretation of the sale provision of the contract. In situations where the contract provides a specific remedy for its breach, some courts presume it to be exclusive, other courts presume it to be non-exclusive, and still others indulge in no presumption but instead look solely to the intent of the parties. See Anno: "Contractual Remedies—Exclusiveness", 84 A.L.R.2d 322, § 2 and cases cited. See also 5A Corbin on Contracts, § 1227. While the parties make no effort to establish the state law applicable to this issue, i. e. whether Missouri or Kansas, we are satisfied that under the law in effect at the time of the relevant events, both states looked to the intention of the parties in situations of

this kind.[3] See Smith v. Quivira Land Co., 153 Kan. 794, 113 P.2d 1077; Mayfield v. George O. Richardson Machinery Co., 208 Mo.App. 206, 231 S.W. 288. We turn then to ascertain the intention of the parties in adopting the critical language of this contract.

■ In support of the trial court's interpretative conclusions National contends that since this was essentially a lease agreement, the normal remedy for its breach is an action for the rent, and that Ryder had no other remedy unless the contract provided it. To this argument Ryder responds, and we think rightly so, that while the contract's main purpose was the lease arrangement, it also contained sale provisions, and upon breach of the promise to purchase, Ryder had available to it all the remedies provided by law to a seller seeking to recover from a breaching buyer, unless the contract provided otherwise.

But, National contends, the contract did provide otherwise. It argues that the mere inclusion of the public sale provision indicates that the parties intended it to be exclusive; that the parties foresaw the possibility of National's refusal to purchase, and provided a remedy; that the parties used the word "may" to indicate that Ryder was not obligated to resell, but that if it did, it had to do so at public sale; and that if the parties had intended the public sale remedy to be non-exclusive, they could easily have said so, or provided no contractual remedy at all. We are not persuaded.

■■ In the first place, the use of the word "may" indicates that the parties intended this remedy to be optional and not exclusive. This is especially so when "shall" is used at numerous other places in the contract to indicate a mandatory aspect of performance. National suggests "may" was used to indicate that

3. The Uniform Commercial Code in § 2–719(1) (b) provides that "resort to a remedy as provided [in the contract] is optional unless the remedy is expressly agreed to be exclusive, in which case it is the sole remedy." This provision as applied to our case would clearly permit recourse to other remedies than public sale. However, the Uniform Commercial Code was not effective in Missouri until July 1, 1965, and in Kansas until January 1, 1966. The relevant events in this case occurred well before either of those dates.

Ryder was not required to resell, but that if it did, it had to utilize a public sale. But we reject this interpretation, for it leads to the illogical and unreasonable result that if Ryder chose not to resell at public sale it had no remedy at all. Surely, if the parties intended this result they would not have provided that Ryder "may" resell at public sale. Next, as to the contention that if the parties intended the remedy to be non-exclusive, they could easily have said so, the short answer is that they could just as easily have provided that it was to be exclusive. No inference either way may be drawn from the failure of the parties to clearly express themselves concerning the exclusiveness of this remedy. Finally, and we think more importantly, is the answer to the question implied by the whole of National's contention, i. e. why insert such a provision if it is not intended to be mandatory. We concede the force of the question, yet reference to one piece of uncontradicted evidence brought out on trial provides an eminently sensible answer. Ryder's expert witness testified that public sale of equipment of this type netted from 30 to 50 per cent less than private sale. With this in mind it seems reasonable to infer that the parties included the public sale provision so that Ryder at its option could resell at public sale, thereby quickly and easily establishing its damages, and yet not be subject to a defense that it had not fully mitigated its losses by selling at private sale. This interpretation of the contract gives reasonable effect to all of its provisions, and we think it the correct one. Judgment n. o. v. was therefore improperly granted on Count II.

Turning now to National's appeal in No. 8670 the sole question presented is whether the court erred in admitting two exhibits, one pertaining to each Count, which were offered by Ryder in evidence of its damages. These exhibits were summaries of supporting documents, and the objection in the trial court and here is that the supporting documents were not all present at the second trial for National's use in cross-examination with respect to the accuracy of the exhibits. We think the exhibits were properly admitted.

The evidential controversy in this case was occasioned by a flood which occurred in Denver, Colorado, in the interim between the two trials. At the pretrial before the first trial the two exhibits were produced and identified; it was then made clear that the exhibits would not be admitted unless the supporting documents were "available for cross examination or had been previously made available." Ryder's counsel at that time indicated that the supporting documents would be available any time National's counsel wished to see them. In the ten months ensuing between pretrial and the first trial, National's counsel made no effort to examine the supporting documents. At the first trial National's counsel requested that the supporting documents be produced and the trial court in our case found that they were. Both exhibits were admitted at the first trial, the one pertaining to Count I without objection, and the other one over objection. Following the first trial part of the supporting documents were shipped to Denver, and the court in our case found that part of them were destroyed by the previously mentioned flood.

At the second trial the judge ruled that absent affirmative proof by National that the two exhibits were inaccurate, they would be admitted upon a showing of four facts: (1) that the exhibits had been admitted at the first trial; (2) that at that trial the supporting documents were in court and available for cross-examination; (3) that all supporting documents presently in Ryder's possession be in court at the second trial; and (4) that any such records not in court at the second trial be unavailable because of the flood. Ryder established these four criteria to the satisfaction of the trial court, and the exhibits were admitted.

National makes two distinct attacks on the admission of the exhibits. It first contends that the four criteria were insufficient in law to protect its

right of cross-examination. Summaries of this type are admissible upon " * * * condition that the mass of data shall, if the occasion seems to require it, be placed at hand in court or at least be made accessible to the opposing party." Board of County Com'rs of Wyandotte County, Kan. v. William J. Howard, Inc., 10 Cir., 230 F.2d 561, 564. See Sam Macri & Sons, Inc. v. United States, 9 Cir., 313 F.2d 119; Wirtz v. Baldor Electric Co., 119 U.S.App.D.C. 122, 337 F.2d 518; cf. Pritchard v. Liggett & Myers Tobacco Co., 3 Cir., 295 F.2d 292; Flame Coal Co. v. U. M. W. A., 6 Cir., 303 F.2d 39; In Re Shelley Furniture, Inc., 7 Cir., 283 F.2d 540. Ryder concedes the applicability of the Board of County Com'rs case, but says in the unique circumstances of this case admission was proper because of the availability of the supporting documents before and during the first trial. National in turn concedes that the court's four criteria would be sufficient to protect its rights if in the first trial it had examined the supporting documents; it says, however, that before it could examine them or cross-examine with respect thereto, Counts I and II were dismissed, thereby obviating any reason to further examine them.

■ Admissibility 'in this case thus turns upon what transpired in the prior proceedings, and we are satisfied from our perusal of that record that the four criteria established for admission were sufficient to protect National's rights. National made no effort during the ten months between the first pretrial and trial to examine the supporting documents which were available upon request; the exhibit in support of Count I to which most if not all the destroyed records pertained, was admitted at the first trial without objection; all supporting documents were found to have been in court at that first trial; and finally it appears that the exhibits were admitted as part of the plaintiff's case, and no cross-examination was attempted—only then, and after defendant had made an extensive offer of proof was the action dismissed. It thus appears that National had ample

opportunity to examine the records, and a substantial opportunity to cross-examine with respect thereto. We think this opportunity was sufficient under the Board of County Com'rs case, and National's failure to take advantage of it, if indeed it did not, does not require the exclusion of the exhibits in this case. See American Vitrified Products Co. v. Wyer, 6 Cir., 221 F.2d 447.

■ National's second distinct contention is that even if the four criteria were legally sufficient, the evidence was insufficient to show they had been met. Specifically it contends that the evidence is insufficient to show that all presently unavailable documents were destroyed in the Denver flood, or that all the supporting documents were in court at the first trial. As to the latter contention the witness Hestand, who supervised the preparation of the exhibits, gave uncontroverted testimony that all the supporting documents were in court at the first trial. And, the testimony of one who closely supervised preparation of the exhibits is competent to establish this fact. See Augustine v. Bowles, 9 Cir., 149 F.2d 93. As to the former contention, Hestand testified that all the supporting documents brought to court in the first trial and still available were in court at the second trial; that he attempted to get from the Denver office all records that had been sent there; and that he had received and brought to court a portion of the records from the Denver office. A second witness testified that the Ryder building in Denver had been under 20 feet of water during the flood, and that most of the records kept there were stored in the basement. National seems to contend that this evidence is insufficient, that Ryder was required to show with more specificity which documents had been sent to Denver, which were stored in the basement and which could not be salvaged. We think that considering the large number of documents involved in this case it would have been unreasonable to require such a specific showing, and the court was warranted in crediting Hestand's testimony that all

records presently available were in court and those not available were unsalvageable.

Finally, it appears that most of the supporting documents were available to National in the second trial. From these records it was unable to show any discrepancy in the summary exhibits. We think the trustworthiness of the exhibits was sufficiently established to justify their admission.

The judgment in No. 8669 is reversed with directions to enter judgment on the jury verdict on Count II. The judgment in No. 8670 is affirmed.