George H. Koster and Bayley Kohlmeier, both of San Francisco, Cal., for a petitioner.

Theron Lamar Caudle, Asst. Atty. Gen. and Ellis N. Slack and S. Walter Shine, Sp. Assts. to Atty. Gen., for respondent.

Before MATHEWS and HEALY, Circuit Judges, and YANKWICH, District Judge.

YANKWICH, District Judge.

## I

### The Nature of the Controversy

Petitioner is a California corporation which for many years was engaged in various enterprises, including farming, grape growing and the manufacture and sale of wines and beers. All its stock is owned by its president and manager, Joseph T. Grace. Between 1921 and 1943, it operated at Santa Rosa, Sonoma County, California, a winery known as the "DeTurk Winery". It sold, under the "DeTurk" label, wines and brandies from grapes grown by it or bought from others. Its wines were considered by the trade as of high quality. In 1942, it sold 114,046 gallons of dry wine in bulk and 7,028 gallons in bottles, at 22.2 cents per gallon, and 46,009 gallons of sweet wine in bulk and 10,268 gallons in bottles, at 36.8 cents a gallon. During the years 1936-1942, the investment in this portion of its business was $150,000, of which $60,000 represented the plant and $90,000 the inventory. The substantial inventory in stock is accounted for by the fact that wines must be held for aging. Late in 1942, Petitioner decided to discontinue its wine business. It, therefore, limited its production for that year to 4,959 gallons from its own grapes, as against a normal production of 200,000 gallons. Notwithstanding this, its entire inventory for that year was 522,761 gallons. In November, 1943, talks began with L. A. Weller, Vice-President of Garrett and Company, Inc., of New York. At no time did Weller show an interest in acquiring the physical properties of the DeTurk Winery by purchase. From the very beginning of the exchange of written communications, in a telegram dated December 28, 1942, the request of Garrett and Company was to submit details if "interested in selling your inventory and leasing winery." The Petitioner, on December 29, offered specified quantities of several types of wine at various prices per gallon and a lease "of winery, distillery, and bonded warehouse" for five years at an annual rental of $12,000. Agreement was finally confirmed by telegram of Garrett and Company, dated December 31, 1942. The price agreed on for all the wine was fifty cents per gallon, twenty per cent of the purchase price to be paid immediately. The lease for the winery was to be for five years, at an annual rental of ten thousand dollars. On the same day, 104,000 gallons were delivered, for which Garrett and Company paid $52,000, the profit from which the Petitioner reported in its 1942 income tax return. The balance of the

wine, 418,761 gallons in all, was delivered in 1943. Petitioner received $124,317.50 for the dry wine and $94,862.41 for the sweet wine. A higher price than fifty cents per gallon was paid for the sweet wine, because 73,628 gallons had a higher sugar content than the California standard. Garrett and Company also agreed to purchase 600 wine barrels at $4.00 each. In view of the discussion to follow, it is interesting to note that although performance of the contract was begun on December 31, 1942, when $52,000 was paid, a formal memorandum of agreement, embodying the terms of the sale was not executed until January 20, 1943, and the lease not until January 30, 1943. This fact has singular significance, in view of the claim of unitary transfer made in this case. Following the execution of the formal lease, the Petitioner surrendered its permit to manufacture and sell wine, in order that Garrett and Company might procure a permit to operate a winery on the premises. The wine stocks, cooperage, labels, list of customers, and the small staff of eight or ten employees were taken over by the purchaser-lessee. Rent was paid under the lease until the end of April, 1944, when the lease was terminated by mutual agreement. On April 15, 1944, Petitioner sold the winery to Taylor & Co. for $150,000.

The profit realized by the petitioner on the transaction was $140,138.58. The petitioner treated the transaction as a sale of the business, and the profits taxable as capital gain. The Commissioner treated the profits as ordinary income and assessed a deficiency of income and excess profit taxes for 1943. The petitioner sought a redetermination of the deficiency by the Tax Court. That Court, on April 5, 1948, found that the proceeds of the transaction constituted income and that no part of it was chargeable to transfer of good will. It assessed a deficiency in excess profits taxes of $124,073.01 for the year 1943.

This is a petition to review the order. In the main, the issue is:

Did the sale of the inventory on hand, the lease of the premises, and the transfer of the enumerated accessories constitute, *in whole or in part*, a capital transaction?

II

Scope of Review

Consideration of the questions involved turns upon the scope of our review of the decision of the Tax Court.

By recent statutory enactment, Internal Revenue Code, Section 1141(a), as amended by Section 36, Public Law 773, 80th Congress, Second Session, 26 U.S. C.A. § 1141(a), it is decreed that this Court's jurisdiction to review shall be "in the same manner and to the same extent as decisions of the district courts in civil actions tried without a jury". This reads into the Internal Revenue Code the provision of the Federal Rules of Civil Procedure that:

"Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." Rule 52(a), Federal Rules of Civil Procedure, 28 U.S.C.A.

In the application of this rule and of the equity rule, which prior to the adoption of the Federal Rules of Civil Procedure governed review of equity cases only and which the rules made of universal application in all civil cases, United States v. United States Gypsum Company, 1948, 333 U.S. 364, 394, 68 S.Ct. 525, reviewing courts have emphasized the importance of the conclusions of the trial judge which derive from his opportunity to pass upon the credibility of the witnesses. And they have declined to resolve a conflict in the testimony of witnesses their own way. Davis v. Schwartz, 1895, 155 U.S. 631, 636, 15 S.Ct. 237, 39 L.Ed. 289; Adamson v. Gilliland, 1917, 242 U.S. 350, 353, 37 S.Ct. 169, 61 L.Ed. 356; Wittmayer v. United States, 9 Cir., 1941, 118 F.2d 808, 810; Gates v. General Casualty Company of America, 9 Cir., 1941, 120 F.2d 925, 927; Augustine v. Bowles, 9 Cir., 1945, 149 F.2d 93, 96; and see "Findings in the Light of the Recent Amendments to the Federal Rules of Civil Procedure", 8 F.R.D. 271, 288-291, and cases cited in footnotes 6-9. The Supreme Court, in a very recent case, United States v. United States Gypsum Company, 1948, 333 U.S. 364, 68 S.Ct. 525,

has stated the scope of this provision in this manner:

"It was intended, in all actions tried upon the facts without a jury, to make applicable the then prevailing equity practice. Since judicial review of findings of trial courts does not have the statutory or constitutional limitations [on judicial review] of findings by administrative agencies or by a jury, this Court may reverse findings of fact by a trial court where 'clearly erroneous.' The practice in equity prior to the present Rules of Civil Procedure was that the findings of the trial court, when dependent upon oral testimony where the candor and credibility of the witnesses would best be judged, had great weight with the appellate court. The findings were never conclusive, however. A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Company, 1948, 333 U.S. 364, 394, 68 S.Ct. 525, 541.

This interpretation is not a new departure. It merely stresses, as courts of appeal (including this court), have done before, that findings are to be given the effect which they formerly had in equity. Equity Rule 70½. See, Equitable Life Assurance Society v. Irelan, 9 Cir., 1941, 123 F.2d 462, 464, and cases cited in footnotes 1 and 2; and see, Guilford Construction Co. v. Biggs, 4 Cir., 1939, 102 F.2d 46; United States v. Still, 4 Cir., 1941, 120 F.2d 876, 878; Katz Underwear Co. v. United States, 3 Cir., 1942, 127 F.2d 965, 966.

■ It is axiomatic that uncontradicted testimony must be followed. Chesapeake and Ohio Railway Company v. Martin, 1931, 283 U.S. 209, 216, 217, 51 S.Ct. 453, 75 L.Ed. 983; San Francisco Association for Blind v. Industrial Aid for the Blind, 8 Cir., 1946, 152 F.2d 532, 536; Foran v. Commissioner, 5 Cir., 1948, 165 F.2d 705. The only exception to the rule occurs when we are dealing with testimony by witnesses who stand impeached and whose testimony is contradicted by the testimony of others or by physical or other facts actually proved or with testimony which is inherently improbable. The classic statement of this rule, is that by Mr. Justice Field in Quock Ting v. United States, 1891, 140 U.S. 417, 420-422, 11 S.Ct. 733, 851, 35 L.Ed. 501. And see Greenfeld v. Commissioner, 4 Cir., 1947, 165 F.2d 318, 319, 320. This Court has applied the same principles repeatedly, in reviewing administrative findings. Illustrative are the immigration cases, in which conclusions of a board on exclusion based upon contradictions in the testimony of a single witness were upheld. Wong Ying Wing v. Proctor, 9 Cir., 1935, 77 F.2d 135; Ng Heu Yim v. Bonham, 9 Cir., 1935, 79 F.2d 655; Lum Sha You v. United States, 9 Cir., 1936, 82 F.2d 83. In giving effect to these norms in a particular case, the burden is upon him who attacks a finding to show that it is clearly wrong. In re American Mail Line, 9 Cir., 1940, 115 F.2d 196, 199; Wittmayer v. United States, 9 Cir., 1941, 118 F.2d 808, 810; Augustine v. Bowles, 9 Cir., 1945, 149 F.2d 93, 96.

### III
### The Petitioner Did Not Part With Any Good Will.
#### (A)
#### Capital Assets.

The Tax Court declined to find, as urged by petitioner, that its good will passed to Garrett & Company, Inc. In reaching this conclusion, the Tax Court gave effect to the statutory provision which, in defining "capital assets", excludes "stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of its trade or business, or property, used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23 (*l*)." 26 U.S.C.A. § 117(a) (1).

The applicable Treasury Regulation provided:

"Gain or loss from a sale of good will results only when the business, or a part of it, to which the good will attaches is sold." Treasury Regulation 111, Section 29.22(a)-10. And see Section 29.117-1.

The petitioner seems to think that on the facts in the case and on the application of the doctrine declared in such cases as Pfleghar Hardware Specialty Co. v. Blair, 2 Cir., 1929, 30 F.2d 614, and White & Wells Co. v. Commissioner, 2 Cir., 1931, 50 F.2d 120, it was entitled to a favorable finding upon the issue presented. We cannot agree. To the contrary, we are of the view that the facts in this case do not bring it within the doctrine declared in those cases. There, the Courts found that the clear intention was to transfer the operating properties for the manufacture of hardware accessories for carriages and automobiles in one case and paper boxes in the other, *as going concerns*.

■■■ The rationale of the ruling is given in the following language of Swan, Circuit Judge, in Pfleghar Hardware Specialty Co. v. Blair, supra:

"Good will has no existence except in connection with a going business; it cannot be separated from the going business to which it is incident. A seller who disposes of his manufacturing plant as a going concern necessarily parts with all those advantages which are inherent in conducting an established business at that plant; in other words, parts with his good will." Pfleghar Hardware Specialty Co. v. Blair, 2 Cir., 1929, 30 F.2d 614, 616.

More, in White & Wells Co. v. Commissioner, supra, it *was not questioned* that there had been a sale of the paperbox factory as a going concern. The sole matter in dispute was "*the amount of profit realized*". And the Court of Appeals, in reversing the Board of Tax Appeals, merely determined that it had adopted *an erroneous method* of computing the amount of the tax.

Petitioner here complains that the Tax Court in this case based its refusal to apply the rulings of the two cases just cited to the facts in this case upon the single ground that there *had not been a sale of the plant in the present case*. We do not so read the findings and opinion of the Tax Court. On the contrary, a study of them, in their entirety, discloses the fact that the Tax Court was convinced that there had been no *intention to transfer* and *no actual transfer* of good will.

■■■ The fact that the Tax Court, in arriving at a correct determination of the facts, may have assigned a wrong legal reason is immaterial. The validity of the finding is to be judged by the facts and inferences from them which give support to it in the record. And here, the Tax Court was right in concluding that, unlike what occurred in the cases on which the petitioner relies, there was no intention to transfer the good will of the wine business of the petitioner, and that, in fact, he parted with nothing more than the inventoried wine, cooperage, labels.

### (B)
### The Elements of Good Will.

■■■ Before elaborating further on the matter, we advert to the fact that in the written documents which relate to the transaction, both before and after its consummation, no mention *whatsoever is made of the good will*. We leave aside, for the moment, the indisputable proposition that oral testimony contradicting written instruments can have no binding effect, in cases of this character. Cf. Woodall v. Commissioner, 9 Cir., 1939, 105 F.2d 474, 478; Jurs v. Commissioner, 9 Cir., 1945, 147 F.2d 805, 810; Gaylord v. Commissioner, 9 Cir., 1946, 153 F.2d 408, 415. And see Helvering v. Coleman-Gilbert Associates, 1935, 296 U.S. 369, 374, 56 S.Ct. 285, 80 L.Ed. 278; Titus v. United States, 10 Cir., 1945, 150 F.2d 508, 511, 162 A.L.R. 991.

We shall analyze further on in the discussion the oral testimony and the effect of the rule just referred to upon the action of the Court in not giving to this testimony the full value which the petitioner claims for it. We come to certain considerations which, to our mind, lead to the inevitable conclusion that the Tax Court was justified in holding that no good will passed in the transaction.

■■■ What is good will?

It is the sum total of those imponderable qualities which attract the custom of a business,—what brings patronage to the

business. Mr. Justice Cardozo, in a famous case, has called it "a reasonable expectancy of preference * * * (which) may come from succession in place or name or otherwise to a business that has won the favor of its customers." Matter of Brown's Will, 1926, 242 N.Y. 1, 6, 150 N.E. 581, 582, 44 A.L.R. 510.

The Supreme Court has held it to mean "every positive advantage that has been acquired by the old firm in the progress of its business, whether connected with the premises in which the business was previously carried on, or with the name of the late firm, or with any other matter carrying with it the benefit of the business." Menendez v. Holt, 1888, 128 U.S. 514, 522, 9 S.Ct. 143, 144, 32 L.Ed. 526.

 So, the good will may attach to (1) the business as an entity, (2) the physical plant in which it is conducted, (3) the trade-name under which it is carried on and the right to conduct it at the particular place or within a particular area, under a trade-name or trademark; (4) the special knowledge or the "know-how" of its staff; (5) the number and quality of its customers. 5 Paul and Mertens, Law of Federal Income Taxation, 1934, Section 52.34, n. 96; Paul, Federal Estate and Gift Taxation, 1942, Sections 18.04, 18.16. In this case, there was no transfer of anything which would correspond to items (1), (2), and (3). To specify: The plant was not sold, but leased for a period of years on a yearly rental basis, a lease which was abandoned by mutual agreement after fourteen months. Neither in the writings which evidenced the transaction nor in the oral testimony is there evidence of an *enforceable* undertaking on the part of the petitioner not to engage in the wine business at Santa Rosa or in Sonoma County. For all we know, the petitioner could have begun a rival business at another plant in competition with Garrett and Company, in which event the latter would have been powerless to stop the petitioner through legal means. Nor, for that matter, is there any evidence of transfer of the right to conduct a wine business under the name of the DeTurk Winery. Indeed, while labels were transferred, there is no evidence that Garrett and Company ever used them on bottles for the wine which they purchased. The "Know-how" of its staff was not transferable. For the petitioner did not possess the right existing, at times, in contracts relating to baseball players or motion picture actors, to transfer employees or lend them to another concern. The only benefit Garrett and Company could derive from the accumulated skill of the petitioner's staff would stem *not from* the purchase of the wine and accessories, but from the willingness of the staff to work for Garrett and Company and the ability of the two to agree upon the conditions of future employment. Equally illusory, so far as practical consequences are concerned, was the transfer of the list of customers. Such transfer did not guarantee the continuance of custom, and Garrett and Company, even without the authorization of the petitioner, was free to solicit the petitioner's former customers if they sought custom among them,—as to which the record is silent. It follows, that there were many elements absent in this case which warranted the Tax Court in finding that the transaction was merely a purchase of certain stock-in-trade and assets and did not constitute a transfer of the good will or of the business of the petitioner as *a unitary whole*. In the last analysis, each case depends upon particular facts. And in arriving at a particular conclusion, the trier of facts must take into consideration all the circumstances proved in the case and draw from them such legitimate inferences as the occasion warrants. And even where several apparently separate transactions are the subject of inquiry, a conclusion that the transfer or acquisition of certain assets was or was not a part of a single transaction, may depend upon the particular facts in each case. And, in determining the matter, the Tax Court is as free to "tie" several transactions together, as it is to "sever" them, in order to decide whether capital gain or loss has accrued. Cf. Helvering v. Security Savings & Commercial Bank, 4 Cir., 1934, 72 F.2d 874.

## (C)
### The Oral Testimony Analyzed.

In what precedes, we have stressed chiefly the terms of the written agreements and the acts which followed their execution. The oral testimony did not strengthen the position of petitioner. We give it in substance.

Prior to October, 1942, petitioner had decided to go out of the wine business. Mr. Joseph T. Grace, president of the petitioner, and its sole stockholder, testified that he told Mr. L. A. Weller, agent of the purchaser, that he would not sell the wine inventory unless he sold everything connected with the business, including the good will. He testified further that he advised Weller that the winery was worth $125,000 and the inventory of wine on hand and the good will were worth $250,000. This latter figure was based on an estimate of $100,000 good will, arrived at by computing the net profits per year, and multiplying them by 5, for a five-year period; and $150,000 inventory.

After various negotiations, the petitioner entered a contract with Garrett & Company, whereby the latter agreed to lease the petitioner's winery and equipment for five years at an agreed rental and to purchase all its wine at 50 cents per gallon. The wine brought approximately $250,000. Grace testified: "I told him (Weller) we wanted $250,000 for the wine inventory and the good will."

"He indicated that Garrett and Company might be interested in leasing the winery and in paying the price to us for the wine that would meet the price we asked for the wine business." The license and the permit to manufacture were surrendered. The bottles and labels, and the plant personnel were turned over to the buyer, but there is no evidence that Garrett & Company ever put out wine under the De-Turk label. Grace testified that the total value of the winery was $375,000. In April, 1944, Garrett & Company was released from the lease agreement, and the plant was sold to others for $150,000.

Apart from Grace's testimony, there was testimony by another witness that the DeTurk Winery had a value in excess of the value of the tangible assets, but the exact amount was not given. There was also testimony that Mr. Grace's method of evaluating the good will was the correct one.

It is to be borne in mind that the sales memorandum dated January 20, 1943, spoke of the petitioner having "sold" and Garrett and Company "bought" the wine inventory.

Grace admitted that there was nothing in the corporate minutes that showed any intention to transfer or actual transfer of the good will. There is no evidence that the good will was carried on the books of the company at any valuation other than the value of the inventories and physical assets, such as the plant. No entries appear to have been made in the books against the item of good will, after the consummation of the transaction. Another very interesting fact speaks against "the unitary theory". Part of the proceeds received in 1942 from Garrett and Company, the petitioner treated as income and included it in its income and excess profits tax for that year. This conformed to the expressed desire of the petitioner during the negotiations that the matter be so treated, in order to avoid too high an excess profits tax in one war year. In his testimony, Grace identified a telegram sent by him to Garrett and Company on December 29, 1942, which stated (among other things) "Anxious to close deal immediately to get part of sales in this year income tax returns." In the face of this record and of the reference in the same telegram and in the answering telegram of Garrett & Company of December 30, 1942, to "inventory" and "lease" and "rental" of plant, the Tax Court was not required to take at its face value Grace's oral statements contradictory of these written documents and others, through which the sale was consummated, to the effect that, at the very time when these exchanges were taking place, it was his intention to part with the good will. As to this undisclosed and floating intention, we are in the same situation as this Court was in In re American Mail Line, 9 Cir., 1940, 115 F.2d 196, 199, when it said:

"We cannot say as a matter of law that the court below was compelled to believe it."

As said in another case:

"The circumstances surrounding the alleged oral agreement, the time, place, and the care with which the written agreement apparently was drawn, all contradict the evidence of petitioner on this point and the Board was justified in concluding that the testimony was incredible." Woodall v. Commissioner, 9 Cir., 1939, 105 F.2d 474, 478. And see, Cohen v. Commissioner, 2 Cir., 1945, 148 F.2d 336.

And, as already appears (Part II (a) and (b) of this opinion), the accompanying legal reasoning of the Tax Court accords with the principles long sanctioned by this Court that only actual transfers of a going business and of the good will, which divest the transferor of the benefits accruing from the ownership of such business or good will shall be considered in determining capital gain or loss. See Stilgenbaur v. United States, 9 Cir., 1940, 115 F.2d 283; United States v. Adamson, 9 Cir., 1947, 161 F.2d 942.

## IV
### No Conversion of Stock in Trade.

One other matter should be adverted to. And it is this: The fact that by selling its stock in trade and leasing its plant, the petitioner divested itself of the means of carrying on the winery business, at least, until it acquired other facilities, did not change the character of the stock in trade and convert it into a capital asset. The petitioner merely chose to discontinue its business when it disposed of its inventory. It did not transfer its business. And the Tax Court was right in so holding. As we read the cases, the instances in which courts have held that such conversion occurred were those in which corporations or individuals were compelled by circumstances beyond their control to liquidate the business, and, in so doing, to dispose of capital assets which partook of the nature of an investment which the taxpayer was compelled to liquidate or were income-bearing assets which it was no longer advisable to hold

on to. Thus, in Graham Mill & Elevator Co. v. Thomas, 5 Cir., 1945, 152 F.2d 564, 565, the taxpayer,—a flour manufacturer,—upon discontinuing its branches, disposed of some promissory notes and accounts receivable. As it was not engaged in the business of selling notes and accounts, the Court held that the sale was not in the course of business to customers "but a part of the ending of a business". Similarly, in Three States Lumber Company v. Commissioner, 7 Cir., 1946, 158 F.2d 61, the sale by a lumber company of timber lands from which they no longer derived income was held to be a sale of capital assets. Rightly. For the primary business of the company was not to sell timber lands but to sell, in the course of business, timber from the lands. These rulings accord with the view of this Court that the sale of timber by logging companies is business. Commissioner of Internal Revenue v. Boeing, 9 Cir., 1939, 106 F.2d 305; and see Williams v. McGowan, 2 Cir., 1945, 152 F.2d 570, 162 A.L.R. 1036.

So without deciding whether liquidation may or may not result in a conversion of stock in trade into capital assets, the important fact in this case is that the transfer which took place was the transfer of the stock in trade, wine, cooperage, labels, which the petitioner sold in the due course of its business to one customer, and from which it had derived its revenue in the past through sales to many customers. It did not sell the plant or any other tangible asset, as did the taxpayers in the cases just cited because they could no longer be held as income-bearing properties. Briefly put, the cases in which conversion was held to have occurred were those in which the taxpayer was compelled to rid himself, not of the things which he sold in due course of business, such as wine, cooperage, and the like, but of physical assets, such as timber lands and notes which could no longer be held as a source of products from which the income was derived.

The Tax Court saw clearly this distinction and concluded correctly that no conversion took place in this case. See

Richards v. Commissioner, 9 Cir., 1936, 81 F.2d 369, 106 A.L.R. 249.

The judgment of the Tax Court is affirmed.

United States Court of Appeals
Third Circuit.