[No. 2588-3. Division Three. October 17, 1978.]

BLUE MOUNTAIN CONVALESCENT CENTER, *Appellant,* v. THE DEPARTMENT OF SOCIAL AND HEALTH SERVICES, *Respondent.*

---

*Golden & Knowlton* and *Albert J. Golden*, for appellant.

*Slade Gorton, Attorney General*, and *Byron L. Brown, Assistant*, for respondent.

ROE, J.—Plaintiff Blue Mountain Convalescent Center appeals a determination by the hearing examiner for the Department of Social and Health Services that a $150,000 payment was for good will, which is not a reimbursable item, WAC 388–96–606(2)(u), under the Department's recently implemented system of cost reimbursement for welfare patients.

Duane Johnson had been employed as Blue Mountain's administrator prior to April 1974, when he executed a lease with the owners. The lease was modified on July 17, 1974. Johnson and his wife (lessees) leased Blue Mountain Villa, a boarding home facility, and Blue Mountain Convalescent Center, a nursing home, for a term of 10 years, with an option to renew the lease "on the same terms for an additional ten (10) years," for a monthly rental payment of $10,330. Lessees also took a right of first refusal in case lessors should decide to sell during the lease term. Lessees agreed to use the facilities only for the specified use and none other. Lessors were expressly exempted from any obligation to repair, rebuild, or replace in case either facil-

ity should be destroyed, and there was provision for pro-rating the rent in the event of partial destruction. The lease included equipment on the premises, but additional equipment purchased by lessees to use at the facility is required to be left there at the end of the term with ownership reverting to the lessors. By one provision, the lessees specifically agreed to purchase the inventory of various supplies. The provision most important to this case is paragraph 13, which reads as follows:

> GOODWILL AND BUSINESS: As part of the consideration for the mutual agreements herein contained, Lessees agree to pay to Lessors for their goodwill and established business, the sum of ONE HUNDRED FIFTY THOUSAND DOLLARS ($150,000.00), which said sum shall be paid FORTY–THREE THOUSAND FIVE HUNDRED DOLLARS ($43,500.00) down and concurrent with execution of this document and the balance of ONE HUNDRED SIX THOUSAND FIVE HUNDRED DOLLARS ($106,500.00) at the rate of ONE THOUSAND TWO HUNDRED EIGHTY–THREE AND 84/100 DOLLARS ($1,283.84) per month which includes interest at seven per cent (7%) per annum on the unpaid principal balance beginning January 1, 1975, and continuing each successive month thereafter until the same be paid in full. Interest to be computed from May 1, 1974. No pre-payment may be made without the written consent of Lessors having been first obtained.

Despite the clear language of this provision, Johnson claims that this payment merely constituted additional rental for the premises; rental would be reimbursable under the Department's cost reimbursement system. The Department characterized the payment as being for nonreimbursable good will, which determination was affirmed by the Superior Court.

At the administrative hearing, the Department presented no testimony, but relied upon the plain language of the lease provision. Johnson's testimony was uncontradicted, and was to the effect that he had leased the "right to run the business for a specified period of time." He stated:

There were two parts to the agreement as far as money was concerned. The lease payment that is made to the lessors for the use of the facility, the business, and then there is a cash request that they had in there for my right to operate the business of $150,000.00.

When asked what he would be able to take with him at the end of the lease term, he answered: "Only the earnings that I have accrued while I had been there as the operator." Johnson testified that he could not depreciate equipment which was at the facility at the beginning of the lease, but could claim depreciation on items that he himself might purchase.

William Hendricks, Blue Mountain's accountant, identified the $10,330–per–month payment as the rental for the facility, and the $150,000 payment as being for "[o]ur right to operate the business." Both he and Johnson stated that the $150,000 was carried on the books as prepaid rent because they "could find no reason to treat it as anything, except a prepaid lease."

■ Lessees challenge as arbitrary and capricious, or as clearly erroneous, the finding that the $150,000 was paid for the lessors' good will.

The good will of a going business is an element which inheres in it and cannot be separated from the whole. *Stanton v. Zercher,* 101 Wash. 383, 172 Pac. 559 (1918). There are many elements, defined in the decisions of this court and other jurisdictions, which comprise good will. Among these are continuity of name, location, reputation for honesty and fair dealing, individual talents and ability of the members of the going business organization, and many others. *J. L. Cooper & Co. v. Anchor Securities Co.,* 9 Wn. (2d) 45, 113 P. (2d) 845 (1941). Good will is an intangible element that inheres in the value of a going business.

*In re Estate of Glant,* 57 Wn.2d 309, 312, 356 P.2d 707 (1960). Lessees strenuously argue that the good will cannot be separated from the business as a going concern. They are correct, but they did take Blue Mountain as a going concern; they took the entire facility, with its equipment,

inventory, patients, staff, and trade name, and still claim not to have acquired the good will.

Lessees rely heavily upon *Grace Bros., Inc. v. Commissioner,* 173 F.2d 170 (9th Cir. 1949), which involved the sale of a winery's considerable inventory along with a lease of the wine–making facilities. The seller attempted to treat the entire profit as capital gain from the sale of the business. The court held that the sale of the inventory was a sale of stock in trade, so that the profits were taxable as ordinary income. It also held that the sale and purchase of assets accompanied by the lease of the winery, which had been abandoned by mutual agreement after 14 months, "did not constitute a transfer of the good will or of the business . . . as *a unitary whole." Grace Bros., Inc. v. Commissioner, supra* at 176. The court stated that

> the good will may attach to (1) the business as an entity, (2) the physical plant in which it is conducted, (3) the trade–name under which it is carried on and the right to conduct it at the particular place or within a particular area, under a trade–name or trademark; (4) the special knowledge or the "know–how" of its staff; (5) the number and quality of its customers. . . . In this case, there was no transfer of anything which would correspond to items (1), (2), and (3). To specify: The plant was not sold, but leased for a period of years on a yearly rental basis, . . . Neither in the writings which evidenced the transaction nor in the oral testimony is there evidence of an *enforceable* undertaking on the part of the petitioner not to engage in the wine business at Santa Rosa or in Sonoma County. For all we know, the petitioner could have begun a rival business at another plant in competition with Garrett and Company, in which event the latter would have been powerless to stop the petitioner through legal means. Nor, for that matter, is there any evidence of transfer of the right to conduct a wine business under the name of the DeTurk Winery. . . . The "Know–how" of its staff was not transferable. For the petitioner did not possess the right existing, at times, in contracts relating to baseball players or motion picture actors, to transfer employees or lend them to another concern. The only benefit Garrett and Company could derive from the

accumulated skill of the petitioner's staff would stem *not from* the purchase of the wine and accessories, but from the willingness of the staff to work for Garrett and Company and the ability of the two to agree upon the conditions of future employment. Equally illusory, so far as practical consequences are concerned, was the transfer of the list of customers.

*Grace Bros., Inc. v. Commissioner, supra* at 176. Relying upon this language, lessees point to the fact that they did not acquire either the exclusive right to use the name "Blue Mountain" or a noncompetition clause. By his own testimony Duane Johnson indicated that he did acquire the business as an entity on the specified premises, which corresponds to items (1) and (2) mentioned in *Grace Bros.* The lease agreement specifically mentions "Blue Mountain Convalescent Center" and "Blue Mountain Villa" as being the subject of the lease; therefore, lessees presumably acquired the right to use the name. *See* RCW 19.80.010. This right is nowhere specifically made exclusive, but since the lessees did pay a valuable consideration for something labeled "good will," they arguably would have a cause of action, sufficient to withstand a motion to dismiss, should the lessors attempt to operate another facility under the same trade name. We do not, however, express an opinion as to the possible merits, in fact or in law, of such a claim.

As to item (4) mentioned in *Grace Bros.*, Johnson was able to continue with the same staff that had worked under him when he was merely a hired administrator. Johnson's own "know–how" as administrator of the facilities would itself constitute an item of the lessors' good will which would pass with the lease of the going concern. Finally, while the customers could not be forced to stay against their will, it would be unlikely that they would leave because of the change in management wrought by the lease; Johnson himself remained the top administrative official at the facilities, assuring continuity of policies and procedures.

Lessees' brief insists that there is "nothing in this lease to substantiate that lessee purchased outright good will

from the lessor." Three points need to be made in this respect. First, there is no evidence that the $150,000 payment for good will represents the sale or lease of any tangible assets; the record is devoid of testimony respecting the fair rental value of the land, buildings, and other physical assets.

Second, the parties entered into their contract knowledgeably. Paragraph 13 of that lease specifically provides a definite payment schedule for an item entitled "GOODWILL." Ordinarily a court will look at a contract and treat it as the parties did, so as not to destroy the interpretation the parties have put upon their transaction. Since the parties entered into their lease agreement with a clear understanding of its substance and content, the lessees ought not now to be allowed to attempt to redefine its terms because they are dissatisfied with the legal consequences. While acting at arm's length and understandably, they agreed that the total price should be allocated, in definite amounts, between monthly rent for the physical plant and good will. "Having thus agreed, [the parties] are not at liberty to say that such was not the substance and reality of the transaction." *Hamlin's Trust v. Commissioner*, 209 F.2d 761, 765 (10th Cir. 1954).

Third, to affirm the decisions below we need not hold that the lessee purchased the good will while merely leasing the business. Paragraph 13 merely states that the lessees "agree to pay" $150,000 to the lessors "for *their goodwill* and established business." (Italics ours.) Such language could as well mean that the good will is also being leased for the same term as the plant and equipment. While payments for good will in a lease situation might not be common in this state, they certainly are not unheard of. *See, e.g., Commissioner v. Chatsworth Stations, Inc.*, 282 F.2d 132 (2d Cir. 1960). Nothing about the nature of good will is analytically inconsistent with the notion that a lease of a going business may include a lease of the good will. Such analysis would be perfectly consistent with the lessees' accounting treatment of this amount as prepaid rent.

Both the lessees and their accountants have also characterized the $150,000 payment as "a flat payment to acquire the lease," opining that a renewal of the lease, as lessees have the option to do, would not call for another such payment. They also believe that the entire $150,000 would be due even if the entire facility were to be destroyed. It is not certain that either of these beliefs is accurate; however, this is not the time to resolve such questions. Suffice it to say that neither of these factors detracts from our conclusion that the $150,000 was paid for good will.

Finally, if the $150,000 payment be a lease of Blue Mountain's good will, we must determine if such payment be nonreimbursable. The applicable regulation, WAC 388–96–606 states, in pertinent part:

> (2) The direct and indirect expenses not allowed shall include, but not be limited to, the following items:
>
> . . .
>
> (u) Goodwill resulting from *purchase* of property or stock in excess of determinable values.

(Italics ours.) Although good will seems to be nonreimbursable only when in conjunction with a purchase, this regulation was specifically intended to exclude from a nursing home's cost reimbursement base items other than actual costs of providing care to welfare patients. We note that the regulation's list of nonreimbursable expenses is not exhaustive. That the regulation did not consider the possibility of leased good will does not operate as a loophole in the lessees' favor. We hold that the regulation's language is sufficiently broad to preclude reimbursement for good will expense, whether arising from a purchase or a lease.

Since we are convinced that the Department's determination and the Superior Court's affirmance were correct, we need not advert to the applicable standard of review. The judgment is affirmed.

MUNSON, C.J., and GREEN, J., concur.