SOLAR NITROGEN CHEMICALS, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent.
SOLAR NITROGEN CHEMS., INC. v. COMMISSIONER
Docket No. 1918-75.
United States Tax Court
T.C. Memo 1978-486; 1978 Tax Ct. Memo LEXIS 30; 37 T.C.M. (CCH) 1849-71; December 6, 1978
Frank E. Wrenick, for the petitioner. Buckley D. Sowards, for the respondent. WILBUR
MEMORANDUM FINDINGS OF FACT AND OPINION WILBUR, Judge: Respondent determined deficiencies in petitioner's Federal income taxes as follows: Year
Deficiency
1964 $ 3,863
1965
222,570
1966
19,626
1967
3,261
1968
1970
2,894
1971
1,242 Due to concessions by petitioner, the only issue for decision is whether the petitioner is entitled to a loss deduction under section 165(a)[1] for the abandonment of wholesale goodwill in the amount of $300,000 in 1968. *31 Findings of Fact Some of the facts have been stipulated and are found accordingly. The petitioner, Solar Nitrogen Chemicals, Inc., is an Ohio corporation which had its principal place of business in Cleveland, Ohio, at the time of the filing of its petition in this case. It filed its Federal income tax returns for the taxable years involved herein with the District Director of Internal Revenue at Cleveland, Ohio. Petitioner was incorporated under the laws of Ohio on February 3, 1959. From incorporation through at least the end of 1971, the Standard Oil Company of Ohio (Sohio) and Atlas Chemical Industries, Inc. (Atlas) each owned 50 percent of the outstanding shares of petitioner. ICI Americas, Inc. (ICI) acquired Atlas some time subsequent to 1971. At all times pertinent hereto, Atlas and ICI, and Sohio, have been unrelated parties, except to the extent of their joint ownership of petitioner. Sohio was involved in the manufacture and sale of agricultural chemicals and fertilizers. These activities were conducted through Sohio's wholly-owned subsidiary, Vistron Corp. Atlas and ICI were involved in the manufacture and sale of chemicals and explosives. Petitioner *32 acquired a chemical plant facility located at Lima, Ohio (the Lima facility) in 1959 from Sohio Petroleum Company, a wholly-owned subsidiary of Sohio. The Lima facility was an ammonia complex, producing ammonia and derivative products and nitrogen solutions. It had been constructed by Sohio during 1955 and 1956, and was operated as the Petro Chemical Plant of Sohio Petroleum prior to its acquisition by petitioner. This facility originally had the capacity to produce 300 tons a day, and its capacity was subsequently increased to approximately 390 tons a day. Subsequent to the acquisition of the Lima facility, petitioner constructed a new chemical plant similar to the Lima facility at Joplin, Missouri (the Joplin facility). The purchase price of the Lima facility, including miscellaneous operating equipment was $19,000,000. The petitioner and respondent, by collateral agreement dated August 2, 1967, assigned $300,000 of the total purchase price to nondepreciable intangibles--identified by the parties herein as wholesale goodwill. The remainder of the $19,000,000 was allocated by agreement, as follows: Land $ 98,000
Building and Equipment
18,440,423
Office Equipment
44,469
Automotive Equipment
6,084
Other Equipment
106,918
Construction in Progress
4,106
*33 From its inception, petitioner was an operating company engaged in the manufacture and marketing of nitrogen and related chemicals, primarily ammonia products. Its principal market during the early years of its existence was comprised of wholesale distributors and co-producers. During the mid-1960's, petitioner and its owners began to develop an interest in the retail distribution of their chemical products. In 1966, Sohio and Atlas, as equal owners, organized the Solar Service Company to enter the retail fertilizer business. This was to be accomplished through the marketing of chemical fertilizers and related agricultural chemical products directly to farmers through retail outlets owned and operated by Solar Service. Many of the products distributed by Solar Service were manufactured by petitioner. By the end of 1966, Solar Service had 29 retail outlets in operation, and an additional 18 sites had been approved for construction or acquisition. Solar Service was then merged into petitioner during the taxable year 1967. From 1967 to July 1968, in addition to the outlets and sites described above, petitioner built 25 additional retail outlets. As of July 1968, petitioner *34 had a total of 82 retail outlets. Despite these business activities, petitioner had no employees of its own. It entered into agreements with the Sohio Chemical Company to act as its agent in the operation of the Lima facility and the retail outlets. Sohio Chemical, as petitioner's agent, provided all personnel for the management and operation of these facilities. Under the agreements, petitioner paid the compensation for the personnel employed at the Lima facility, and the retail outlets. For its services, Sohio Chemical received a management fee. Similar arrangements were made by petitioner with Atlas for the management and operation of the Joplin facility. On July 1, 1968, petitioner leased the Lima facility to Vistron and the Joplin facilities to Atlas under separate lease agreements for a term of 8 years. The lessees had options to renew for two additional terms of 4 years each. With the exception of the description of the demised premises, the two agreements were nearly identical. The lease provided for annual rental equal to petitioner's depreciation on the leased facility during each calendar year plus 6 percent of its depreciated book value as of the first day *35 of such year. [2] The agreement also provided that: The method of determining said depreciation and depreciated book value shall be as has been heretofore utilized by Lessor for financial reporting purposes. In the best judgment and opinion of the parties, the depreciated book value as of July 1, 1968, fairly represents the fair market value of the Leased Property as of that date. The $300,000 of nondepreciable intangibles that both parties agree consists of and is attributable to wholesale goodwill was not included in the rent base. The lessees were permitted to use the leased premises for such lawful purposes as they determined, but were prohibited from assigning the leases or subletting the premises without the prior written consent of the petitioner. The lessees were required to make arrangements for, and/or the payment of, the following: property taxes and assessments (as additional rent), utilities, *36 insurance, maintenance, replacement of any item of leased property under prescribed circumstances, [3] to perform the turn around maintenance program, [4] and conform their activities to the terms of petitioner's mortgages on the demised premises. The lessees also had the right to effect alterations of the leased property, at their expense. In addition, the lessees could select from among various alternatives regarding the the proceeds from insured damage to the property and awards in eminent domain, conditioned upon the lessee's contemporaneous exercise of a purchase option. *37 Upon the failure to pay rent (or in the event of the lessee's bankruptcy or certain other contingencies) petitioner could, among other options, reacquire possession and terminate the lease. The lease also provided the following option to purchase: Option to Purchase. In addition to the purchase options hereinbefore granted, [in the lease] Lessee shall have the option to purchase all of the Leased Property at the end of the primary term of the Lease, and at the end of each renewal term thereof in the event the Lease shall be renewed as provided [in the lease]. The purchase price shall be the depreciated book value used as the basis for computing rental pursuant to the terms [of the lease] as of the date of such purchase. The Lessee shall give the Lessor written notice of his intent to exercise his option to purchase the Leased Property at least three months before the effective date of such purchase and shall pay the purchase price within sixty (60) days after such effective date or as soon thereafter as such depreciated book value has been computed. On July 1, 1968, petitioner also leased its 82 retail outlets to Vistron. This lease agreement contained substantially *38 the same terms and provisions as the leases of the Lima and Joplin facilities, although the description of the demised premises (the 82 retail outlets) was different and the lease granted an option to Vistron to acquire sites for retail outlets. Most significantly, in negotiating the lease of the retail facilities, petitioner and Vistron included an amount of $302,357 for retail goodwill in the total rental base for rental computation purposes. This was the amount of financial goodwill, as adjusted, carried on petitioner's books on January 1, 1968 in connection with the retail outlets. The inclusion of an amount for retail goodwill in the rental base reflected the parties' determination that the retail outlets possessed an existing goodwill value that should be recognized. [5]
*39 As a result of leasing its assets to Vistron and Atlas, petitioner ceased to exist as an operating company in the fertilizer business as of July 1, 1968. In addition, it disposed of its entire inventory on or about July 1, 1968. Petitioner became strictly a lessor, exercising no control or influence over the operation of the leased facilities, and has conducted no other business since that time. Petitioner had, at no time prior to trial, regained possession or made any attempt to regain possession of the leased facilities. Vistron utilized the assets it leased from petitioner and became an operating company in the retail fertilizer and manufacturing business. At no time since July 1, 1968 have Vistron and Atlas together utilized the leased facilities in any form of joint venture, partnership, association or similar relationship. The three leases petitioner entered into with Vistron and Atlas were the culmination of much study by petitioner regarding its future in the agricultural chemical business. The studies indicated that the Lima and Joplin facilities were nearly obsolete because their capacities for production were too small, having between 25 and 30 percent of the *40 daily capacity of the most recently constructed producing facilities. Expansion of petitioner's facilities was necessary if it were to remain competitive in the chemical business. The cost of such expansion would exceed $100,000,000, and petitioner would need the financial backing of its two owners in order to undertake such capital expansion. Atlas was unwilling to make such a financial commitment, thereby precipitating the effective separation of petitioner's production facilities between its owners through the leasing transactions. OPINION Prior to 1968, petitioner was engaged in the manufacture and distribution of various chemical products, primarily ammonia products and fertilizer. These products were manufactured at petitioner's two facilities located at Lima, Ohio, and Joplin, Missouri. The Lima facility was acquired by purchase in 1959, with $300,000 of the total purchase price of $19,000,000 being allocated to nondepreciable intangibles--identified by the parties herein as wholesale goodwill. During 1968, petitioner discontinued its business activities and leased all its operating assets to two corporations, each of which was related to petitioner, and disposed of *41 its inventory. Petitioner wrote off its financial books the wholesale goodwill attributable to the Lima facility, and claimed a deduction on its 1968 income tax return for the loss due to its abandonment of goodwill. The only question for decision is whether petitioner is entitled to a loss under section 165 for the abandonment of wholesale goodwill in the amount of $300,000 in 1968. Petitioner contends that it abandoned the wholesale goodwill associated with the Lima facility when, in 1968, it discontinued the business and leased the underlying assets to Vistron, and is therefore entitled to a loss deduction. Respondent, on the other hand, contends that petitioner sustained no loss in 1968 because the leasing arrangement between petitioner and Vistron was not a closed and completed transaction, and did not give rise to the abandonment of the goodwill. We agree with petitioner.
The applicable statutory provision is section 165(a) which permits a taxpayer to deduct "any loss sustained during the taxable year and not compensated for by insurance or otherwise." The pertinent regulation provides, *42 with respect to the nature of the loss allowable, that To be allowable as a deduction under section 165(a), a loss must be evidenced by closed and completed transactions, fixed by identifiable events, and * * * actually sustained during the taxable year. Only a bona fide loss is allowable. Substance and not mere form shall govern in determining a deductible loss. [Sec. 1.165-1(b), Income Tax Regs.] [6]
We believe that the *43 termination of petitioner's operations, the disposal of its inventory, and the lease of its facilities pursuant to the particular lease before us represents a closed and completed transaction pursuant to which petitioner intended to abandon and did abandon the remaining wholesale goodwill, if any, that continued to be attached to the Lima facility. We base this conclusion on a number of factors. First, petitioner discontinued its entire fertilizer business, consisting of two manufacturing plants and all of its retail activities. It accomplished the cessation of its business activity by transferring possession of all its operating assets under the three leases, and by selling its entire inventory. Second, what remained to petitioner after discontinuing its business activities was the bare legal title to the manufacturing facilities and the retail outlets. The rent payable to petitioner under the Lima facility lease was based solely upon the annual amount of depreciation of petitioner's remaining capital investment in the assets (book value), plus a designated percentage return (either 3 percent or 6 percent) on the capital investment that was independent of income generated by *44 the leased assets. Finally, petitioner had no realistic prospect for or intention of reentering the agricultural fertilizer business once it leased the assets to Vistron and Atlas. [7] The original lease term was 8 years, and the lessees were granted options to renew the lease for two 4-year periods. Moreover, petitioner would probably never regain possession because the lessees were granted options to purchase the leased premises at the book value remaining at the time an option to purchase was exercised. Considered as a whole and in light of the practical realities, the transaction was tantamount to a gradual disposition of the assets. *45 The economic realities surrounding the facilities leased support our conclusion that petitioner had permanently abandoned the fertilizer business. If, after July 1, 1968, the facilities leased were economically viable, then the lessees were likely to exercise their options to renew or purchase. If not economically viable, possession of the premises might be returned to petitioner under the leases after 8, 12 or 16 years. The possibility of such return to petitioner, however, is not to suggest that petitioner would or could reenter its prior business. The combination of petitioner's lack of capital and the continuing obsolescence of the Lima facility lead us to conclude that it was virtually certain petitioner would not reenter the agricultural chemicals business even if the assets were eventually returned. We believe in this respect this case is analogous to Metropolitan Laundry Co. v. United States,100 F. Supp. 803 (N.D. Cal. 1951). Under threat of condemnation proceedings, taxpayer leased its laundry plant facilities to the United States during World War II. Concurrent with the lease, the delivery equipment was sold, and the routes abandoned. After the *46 war, the taxpayer unsuccessfully attempted to reestablish his business. There as here, the Government cited Grace Bros., Inc. v. Commissioner,173 F.2d 170 (9th Cir. 1949), affg. 10 T.C. 158 (1948), in arguing that goodwill could not be disposed of separately from the business that was leased, and therefore a "closed and completed" transaction was absent. The Court rejected the Government's argument, emphasizing that the taxpayer could no longer operate its plant, and retained only the bare legal title with no immediate prospect of regaining possession. We believe these comments encompass the case before us. [8]
*47 Respondent rests his entire case solely on the theory that a leasing arrangement is not a closed and completed transaction giving rise to disposition or abandonment of assets, including intangibles. We emphasize that respondent does not argue, assuming the leasing arrangements before us may be viewed as a closed and completed transaction, that the goodwill was not in fact abandoned. In fact, the parties have specifically stipulated that "no portion of the wholesale goodwill was included in the wholesale lease rental computation." Atlas and Sohio, the two 50 percent owner of petitioner, were not related in any way and had adverse interests that manifested themselves throughout the lease negotiations. To the extent the rental under the lease of the Lima facilities to Vistron did not fully reflect the underlying value of the Lima assets (including goodwill), Atlas would simply be transferring funds to Vistron. [9]
*48 We believe that the declining business of the Lima facility necessitated a lease of the physical plant for use in Vistron's business, the lease was for a fair rental and assumed an abandonment of goodwill. The agreement was worked out at arm's-length between Sohio and Atlas. The stipulation that wholesale goodwill was not included in the rental base is in sharp contrast to the inclusion of retail goodwill into the rental base of retail rental facilities. While there is some indication that Vistron may have continued to serve some of the customers of petitioner subsequent to the lease, there is little in the record to indicate the number or relative importance of these customers in relation to Vistron's total business, the expectation as to the duration or stability of these relationships, or their future prospects. [10] What is clear is the decline of the prospects for the wholesale business, and that in good faith bargaining between unrelated principals (Sohio and Atlas) having adverse interests, wholesale goodwill was excluded from the rental base of the Lima facility. On this record, we must hold for petitioner. *49 Decision will be entered under rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended.↩
2. For the first and last 6 months of the basic 8-year lease the 6 percent figure was 3 percent.↩
3. The practical effect of the lease provisions requiring the lessee to maintain and replace the leased property, coupled with the option granted the lessee to purchase moveable property, was that petitioner at no time was under any obligation to maintain the equipment. ↩
4. The lease agreements provide that: Lessee agrees to perform during 1968 the usual and customary turn around maintenance program as heretofore performed by Lessor. In consideration of the performance of such program, Lessor agrees to pay Lessee Four Hundred Thousand Dollars ($400,000.00) promptly upon notice that such program has been undertaken.↩
5. Despite this determination, retail goodwill as established for tax purposes in the amount of $329,190 was reflected on petitioner's 1968 Federal income tax return as a reconciliation of financial and tax accounting, and claimed as a tax deduction for the abandonment of retail goodwill. Petitioner conceded at trial that respondent's disallowance of the claimed deduction for the abandonment of retail goodwill was proper.↩
6. See also sec. 1.165-1(d)(1), Income Tax Regs., which provides: (d) Year of deduction. (1) A loss shall be allowed as a deduction under section 165(a)↩ only for the taxable year in which the loss is sustained. For this purpose, a loss shall be treated as sustained during the taxable year in which the loss occurs as evidenced by closed and completed transactions and as fixed by identifiable events occurring in such taxable year. * * *
7. An important factor in an abandonment loss is the taxpayer's intention. This Court has stated "that to be entitled to an abandonment loss, the petitioner must show an intention 'to abandon the property, coupled with an act of abandonment, both of which must be ascertained from all of the surrounding facts and circumstances.'" Massey-Ferguson, Inc. v. Commissioner, 59 T.C. 220, 225 (1972); see Boston Elevated Railway Co. v. Commissioner, 16 T.C. 1084, 1108 (1951), affd. 196 F.2d 923↩ (1st Cir. 1952).
8. Grace Bros. v. Commissioner,173 F.2d 170 (9th Cir. 1949), affg. 10 T.C. 158 (1948), cited by petitioner involved the lease of plant facilities and the sale of inventories. While not concerned with an abandonment loss, the Court held the petitioner lessor did not part with goodwill pursuant to the lease. Since we come to the same conclusion and also find the retained goodwill worthless, it is difficult to see how the Grace Bros. case assists respondent
.↩
9. There is nothing in the record suggesting (nor does respondent suggest) that the failure to include wholesale goodwill in the Lima lease was offset by any corresponding adjustments in the Joplin lease to Atlas. It would be an enormous coincidence (and there is nothing in the record to suggest it occurred) if the Lima and Joplin facilities had the same rental values, and the parties agree that there was no wholesale goodwill associated with the Joplin facilities.↩
10. Respondent made no issue of this either at trial or on brief (either in his original or reply brief). But one of the petitioner's witnesses, in response to a question from the Court, speculated that some of this service continued for an unknown period, although the wholesale business was going down hill.↩